## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PATRICIA CHAVEZ-RODRIGUEZ,

       Plaintiff,

vs.                                                                                  No. CIV 07-0633 JB/DJS

CITY OF SANTA FE, MAYOR DAVID COSS,
in His Official and Individual Capacity,
COUNCILOR KAREN HELDMEYER,
in Her Official and Individual Capacity,
JOHN B. "JACK" HIATT in His Official
and Individual Capacity,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiff's, Patricia Chavez-Rodriguez,

Motion and Memorandum for Summary Judgment that She Has Suffered a Materially Adverse

Employment Action, filed April 4, 2008 (Doc. 85)("Adverse Action Motion"); (ii) the Defendants'

Motion and Memorandum to Strike Plaintiff's Motion and Memorandum for Summary Judgment

that She Has Suffered a Materially Adverse Employment Action [Doc. 85], filed April 16, 2008

(Doc. 97)("Motion to Strike")(brackets in original); (iii) the Plaintiff's Motion and Memorandum

for Partial Summary Judgment that Her Speech was on a Matter of Public Concern and Protected

Speech as a Matter of Law, filed June 17, 2008 (Doc. 127)("Protected Speech Motion"); (iv) the

Defendants' Motion and Memorandum in Support Thereof for Judgment on the Pleadings on Count

I of Plaintiff's Complaint (First Amendment Rights Under the United States and New Mexico

Constitutions), filed July 31, 2008 (Doc. 139)("Pleadings Motion"); and (v) Defendants' Motion and

Memorandum in Support for Partial Summary Judgment on First Amendment Retaliation (Count

I), filed August 11, 2008 (Doc. 151)("Retaliation Motion"). The Court held hearings on September

25, 2008, and October 7, 2008.  The motions present a variety of issues, but the Court has grouped them together for this memorandum opinion and order because the issues in several motions overlap, and all the motions concern the freedom of speech claims that Plaintiff Patricia Chavez-Rodriguez raises in Count I of her Complaint.  The Court first considers the Protected Speech Motion and Pleadings Motion together.  Because Chavez-Rodriguez' communications with the Santa Fe City Council were pursuant to her employment duties, but her contact with the Speaker of the New Mexico House of Representatives, Ben Lujan, was not, the Court will grant in part and deny in part each motion.  The Court then considers the Motion to Strike, Adverse Action Motion, and Retaliation Motion together.  Because the Court concludes that the Adverse Action Motion is appropriate, as it stated at the hearing on September 25, the Court will deny the Motion to Strike. The Court will also grant in part and deny in part the Adverse Action Motion, because the Court concludes that a transfer would be a materially adverse action, but there is a genuine issue of material fact whether Chavez-Rodriguez was transferred.  Because Chavez-Rodriguez has presented sufficient evidence that a jury could find that her protected speech was a significant factor in the Defendants taking several possible materially adverse employment actions against her, but that not all of the retaliatory actions she alleges were materially adverse, and not all of the Defendants can be liable for all the adverse actions, the Court will grant in part and deny in part the Retaliation Motion.

## FACTUAL BACKGROUND

Chavez-Rodriguez became the Director of Senior Services of the City of Santa Fe in May, 2004.  As of January 19, 2007, she had been a public servant for twenty-two years.  The Division of Senior Services is funded through a number of sources, including from the private sector, from the City of Santa Fe, from the County of Santa Fe, from the State of New Mexico, and from the

United States.  The Division has an annual budget of $4,000,000.00.

The Division supplies meals, transportation, and healthcare services to the elderly of the City and County of Santa Fe.  According to Chavez-Rodriguez, the Division must comply with federal law, i.e., the Older Americans Act, in the delivery of services.  The Area Agency on Aging ("AAA"), along with the Corporation for National Community Services ("CNCS"), oversee the administration of the federal funds for the Division.

### 1.    **Relevant Facts for the Protected Speech and Pleadings Motions.**

Chavez-Rodriguez contends that Ruben Lovato, her supervisor for part of the material times, described her as "the pro and most informed person about that Division and that's it."  Exhibit B to Protected Speech Motion, Deposition of Ruben Lovato at 120:23-24 (taken December 6, 2007)("Doc. 127-2")("Lovato Dep.").  "She knows her stuff."  Id. at 122:25-123:2.  "She knows the seniors, I guess, and the workings of the seniors in the department, I mean the divisions and their functions."  Id. at 9:16-18.

In the Defendants' response to Chavez-Rodriguez' rule 56 statement of material facts, the Defendants contend that Lovato's statements about her are not material.  The Defendants admit that Lovato was Chavez-Rodriguez' supervisor for the period of time beginning in late April 2006 for approximately eleven months.  The Defendants deny that Lovato testified that Chavez-Rodriguez is "the pro and most informed person about that Division and that's it."  The Defendants contend that statement is from a surreptitious tape recording and was not made under oath.  See Defendants' Response in Opposition to Plaintiff's Motion for Partial Summary Judgment that Her Speech was on a Matter of Public Concern and Protected as a Matter of Law [Doc. 127] ¶ 1, at 2, filed July 31, 2008 (Doc. 138)("Response to Protected Speech Motion")(brackets in original).  The Defendants further contend that whether Chavez-Rodriguez is knowledgeable about the division of Senior

Services or "knows her stuff" is not material to the decision whether her statements were protected as a matter of public concern.

Chavez-Rodriguez' last performance appraisal from the City of Santa Fe was on December 5, 2002. The appraisal was outstanding, and Chavez-Rodriguez submitted the appraisal for the Court's review. The Defendants contend that the appraisal is not material, but admit that the appraisal that Chavez-Rodriguez has submitted is her appraisal. The Defendants contend that Chavez-Rodriguez' performance appraisal for a different position held – Senior Services Manager – for her performance three years before the incidents at issue in the Complaint is not relevant or material to the issue whether her statements or actions were on matters of public concern and protected under the First Amendment. See id. ¶ 2, at 3.

Before the initial budget meeting, Chavez-Rodriguez advised her supervisor and the City Manager that they could not change "Federal and State dollar amounts." Electronic mail from Patricia C. Rodriguez to Robin Shute ¶ 1, at 1 (dated May 9, 2005)(Doc. 127-3). The Defendants admit this allegation in part, conceding that Chavez-Rodriguez advised Robin Shute via the electronic mail that the proposed City budget for the Division of Senior Services should reflect the same amount of federal and state dollars as the 2004-2005 budget did. The Defendants admit that it was Chavez-Rodriguez' opinion that only AAA staff are authorized to change federal and state dollar amounts. See Response to Protected Speech Motion ¶ 6, at 4.

Budget cuts to Senior Services were proposed at the initial budget meeting. Chavez-Rodriguez opposed the budget transfers as illegal. See Exhibit J to Protected Speech Motion, Volume I of Chavez-Rodriguez Dep. at 74:12-19 (taken March 4, 2008)("I Chavez-Rodriguez Dep.")(Doc. 127-3). Chavez-Rodriguez believed that the budget transfers would "seriously jeopardize the health and welfare of New Mexicans," and would place the Division out of

compliance with federal law. Id. at 75:13-23, 155:5-15. Chavez-Rodriguez contends that, following the initial budget meeting, she was reprimanded. See Exhibit K to Protected Speech Motion, Written Reprimand (dated May 24, 2005)(Doc. 127-3).

The Defendants admit in part and dispute in part the events surrounding the initial budget meeting. The Defendants admit, for the purposes of this motion, that Chavez-Rodriguez believed that alleged budget transfers would seriously jeopardize the health and the welfare of New Mexicans, and would place the Division out of compliance with federal law. The Defendants, however, dispute that Chavez-Rodriguez was reprimanded by being given a copy of the written reprimand. Chavez-Rodriguez testified under oath that she never received this reprimand. See Exhibit DD to Response to Protected Speech Motion, I Chavez-Rodriguez Dep. at 62:4-12 (Doc. 138-2). The Defendants state that they produced this document, Bates stamped 2233, in response to Plaintiff's First Set of Interrogatories, Interrogatory Nos. 12 and 13 requesting documents related to complaints regarding Chavez-Rodriguez. See Response to Protected Speech Motion at 4 n.1. This document is a draft document and was not delivered to Chavez-Rodriguez. The Defendants also contend that Chavez-Rodriguez has no substantiation that any proposed budget cuts were "illegal." Exhibit GG to Response to Protected Speech Motion, Affidavit of Rita Maes ¶¶ 7-13, at 2-3 (executed July 17, 2008)(Doc. 138-2).

After the budget cuts were proposed, the AAA could not accept the proposed budget. See Exhibit L to Protected Speech Motion, Letter to Patricia Chavez-Rodriguez at 1 (dated May 24, 2005)(Doc. 127-3). The AAA requested justification regarding "why the units are being reduced so drastically." Id. ¶ 2, at 1. After the initial budget meeting, Chavez-Rodriguez contacted individual City Councilors. See Exhibit M to Protected Speech Motion, I Chavez-Rodriguez Dep. at 155:16-24. Chavez-Rodriguez contacted Ernesto Ramos, Director of the Corporation for National

Community Service, a federal agency overseeing grant funding for senior services programs in New Mexico. See Exhibit N to Protected Speech Motion, Affidavit of Ernesto Ramos ¶ 5, at 1 (executed May 20, 2008)(Doc. 127-4).

The Defendants admit, for purposes of the Protected Speech Motion, that Chavez-Rodriguez brought her concerns regarding the Senior Services budget to Ramos' attention in 2005 when he was the Director of the Corporation for National Community Service. See id. ¶ 10, at 5.

The Defendants dispute that Chavez-Rodriguez contacted individual City Councilors, as the records supplied state that she discussed services involving City and County residents in a special meeting with the governing body. See Exhibit M to Protected Speech Motion, I Chavez-Rodriguez Dep. at 155:16-24.

Chavez-Rodriguez contends that Ramos determined that the budget transfers were illegal. See id. ¶ 6, at 2. The Defendants admit in part and deny in part that Ramos made such a determination. The Defendants dispute the allegations that the proposed budget transfers were illegal and dispute that Ramos' affidavit establishes that he determined the budget transfers were illegal. The Defendants also contend that the affidavit establishes only his belief that budget transfers were illegal, but does not indicate how he came to that belief. See Response to Protected Speech Motion ¶ 9, at 5.

Further, Chavez-Rodriguez spoke with Lujan concerning the illegal cuts. Lujan and Chavez-Rodriguez were at a volunteer banquet when Lujan asked her how she was doing, to which she responded:

> [W]ell, you know, Mr. Speaker, I'm really, really, really concerned because – I'm worried that the program is in jeopardy of being dismantled as it – you know, as it has existed for over 25 years. I'm really, really, really worried about the funding. I'm worried that money has been cut from the food line item.

Exhibit O to Protected Speech Motion, I Chavez-Rodriguez Dep. at 82:17-24.   The Defendants admit in part and deny in part this statement occurred.   The Defendants admit, for the purposes of the Protected Speech Motion, the statements that Chavez-Rodriguez made to Lujan, but they dispute that Chavez-Rodriguez contacted Lujan.   See Response to Protected Speech Motion ¶ 10, at 5.

Chavez-Rodriguez contends that it was a violation of City policy for Chavez-Rodriguez to contact City Councilors directly.   See Lovato Dep. at 35:9-19.   The Defendants dispute this contention and argue that Lovato's deposition establishes only that it was Lovato's position that his subordinate staff should go through the chain of command – specifically, the City Manager – before contacting individual City Councilors.   See Response to Protected Speech Motion ¶ 11, at 5.

Chavez-Rodriguez contends that Lovato testified that, when he became Chavez-Rodriguez' supervisor, Defendant and City Councilor Karen Heldmeyer wanted Chavez-Rodriguez out of her job.   See Lovato Dep. at 70:2-3.   The Defendants contend that Lovato's statement is not material and dispute that he made the statement.   The Defendants maintain that Lovato never testified that Heldmeyer wanted Chavez-Rodriguez out of her job.   The Defendants state that the transcript which Chavez-Rodriguez has submitted is an incomplete excerpt of a surreptitious audio recording that she made of a conversation with Lovato which was played at Lovato's deposition.   Lovato testified under oath that he did not recognize the conversation and did not know what Chavez-Rodriguez was talking about on the audio recording.   See id. at 68:20-23, 69:6-8.   The Defendants further contend that this disputed fact is not material to the Court's determination whether Chavez-Rodriguez' speech is public speech that the First Amendment protects.

When Chavez-Rodriguez asked Lovato where "this" is coming from, Lovato stated: "[O]ne was Heldmeyer" and "one was the mayor," and that Heldmeyer wanted Chavez-Rodriguez out because of the initial budget meeting.   Lovato Dep. at 68:9-16, 70:9-13.   The Defendants maintain

the statement is immaterial and dispute the accuracy of the statement.  The Defendants contend that neither Heldmeyer nor Defendant and Mayor David Coss ever asked Lovato to remove Chavez-Rodriguez from her position.  See Response to Protected Speech Motion ¶ 4, at 3.  Further, the Defendants argue that their actions are not relevant or material to whether Chavez-Rodriguez' actions were matters of public concern and protected speech under the First Amendment.

When asked why Heldmeyer wanted Chavez-Rodriguez out, Lovato stated: "Because of the first initial budget meeting . . . ."  Lovato Dep. at 70:16-18.  The Defendants maintain that this evidence is not material and dispute the accuracy of the statement.  Examiner Daniel J. O'Friel, Chavez-Rodriguez' counsel, interrupted Lovato's testimony, and Lovato's explanation of the audio tape was not completed because the deposition was interrupted by counsel calling the Court regarding the surprise audio tape  being played at the deposition.  See id. at 70:2-73:25.

### 2.      Relevant Facts for the Adverse Action Motion and Motion to Strike.

The Court has already discussed in some detail the facts surrounding Chavez-Rodriguez' alleged transfer from her position as Director of Senior Services to a new job.  See Memorandum Opinion and Order at 2-6, filed October 9, 2008 (Doc. 212)("October 9 Memo.").  The Court will therefore not repeat them here.

### 3.      Relevant Facts for the Retaliation Motion.

Many of the facts relevant to the Retaliation Motion are already laid out above, and in the October 9 Memo.  In addition to those facts, there are several factual issues that are distinct to this motion.

The Defendants contend that Chavez-Rodriguez believed that Coss wanted her removed from her position because Coss believed that she was "spearheading" a drive to split up the City and County senior services.  Exhibit 10 to Retaliation Motion, Volume II of Deposition of Patricia

Chavez-Rodriguez at 298:13-19 (taken March 13, 2008)(Doc. 151-4)("II Chavez-Rodriguez Dep."). They also maintain that according to Chavez-Rodriguez, Coss told Lujan that her support for the separation was one reason why he wanted her removed, which Chavez-Rodriguez characterized as a lie. See Exhibit 2 to Retaliation Motion, I Chavez-Rodriguez Dep. at 131:22-132:12. The Defendants contend that Coss believed that Chavez-Rodriguez was in favor of the separation. See Exhibit 11 to Retaliation Motion, Deposition of David Coss at 65:16-25 (taken March 5, 2008)(Doc. 151-4)("Coss Dep."). Chavez-Rodriguez admits the Defendants' contentions.

The Defendants also contend that Chavez-Rodriguez makes several other allegations about Coss' actions, specifically: (i) that he threatened that Chavez-Rodriguez "will get hers" to union officials, see I Chavez-Rodriguez Dep. at 133:11-15; (ii) that he failed to respond to a request for a meeting, see II Chavez-Rodriguez Dep. at 256:7-13; (iii) that he reclassified an employee under Chavez-Rodriguez to part-time without her involvement, see id. at 256:21-257:12; and (iv) that Coss sent others to a meeting with the Secretary of Aging and Long Term Care during January 2007, when Chavez-Rodriguez was on leave, see id. at 252:8-255:20. Chavez-Rodriguez admits that she is making all those allegations.

The Defendants also contend that Coss did not direct Defendant John B. "Jack" Hiatt to remove Chavez-Rodriguez from her position, and that Coss was informed by Hiatt that Hiatt had ordered Ruben Lovato to have Chavez-Rodriguez moved to a different position. See Coss Dep. at 71:3-72:13. Chavez-Rodriguez disputes this contention and argues that there is evidence that Coss wanted to have her removed. See, e.g., I Chavez-Rodriguez Dep. at 131:22-132:12.

The Defendants contend that, although Chavez-Rodriguez alleges that Hiatt swung a baseball bat in her direction, the testimony of three witnesses contradicts her version of the events. The Defendants argue that Hiatt was merely giving a slow swing of the bat while joking with Lovato

about playing softball.  See Exhibit 13 to Retaliation Motion, Affidavit of Ron Vialpando ¶¶ 5-10, at 1-2 (executed August 7, 2008)(Doc. 151-5); Exhibit 14 to Retaliation Motion, Affidavit of Adele Teresa Rodriguez ¶¶ 4-8, at 1-2 (executed August 5, 2008)(Doc. 151-5); Exhibit 15 to Retaliation Motion, Lovato Dep. at 56:9-58:13.  Chavez-Rodriguez disputes this characterization of the incident and contends that Hiatt swung the bat in her direction and that she was afraid that Hiatt might hit her.  See Exhibit 25 to Response to Retaliation Motion, Deposition of Patricia Chavez-Rodriguez at 304:16, 306:12-307:1.

The Defendants also contend that Chavez-Rodriguez makes several allegations against Heldmeyer: (i) that Heldmeyer told Lovato she wanted Chavez-Rodriguez transferred to a community center where she could "use her pretty little smile at the front desk to greet people," I Chavez-Rodriguez Dep. at 133:21-134:3; (ii) that Heldmeyer told Chavez-Rodriguez that she (Chavez-Rodriguez) was difficult to deal with, see id. at 135:1-6; (iii) that Heldmeyer attended a meeting unannounced and asked questions that had already been asked; (iv) that Heldmeyer was furious with Chavez-Rodriguez because she responded to an annual analysis instead of Lovato, her supervisor; and (v) that Heldmeyer wanted Chavez-Rodriguez removed from her position.  See II Chavez-Rodriguez Dep. at 192:17-193:2, 194:5-16, 298:20-299:1.  Chavez-Rodriguez admits that she is making these allegations.

The Defendants also contend that Chavez-Rodriguez has received two written reprimands, one on May 11, 2005, for inappropriate behavior, see Exhibit 17 to Retaliation Motion, Memo from Mike P. Lujan to Patricia Rodriguez (Doc. 151-5), and one on April 27, 2006 for unauthorized leave, see Exhibit 18 to Retaliation Motion, Memo from Ruben Lovato to Patricia Chavez-Rodriguez (Doc. 151-5).  They further contend that Rita Maes, a previous supervisor, counseled Chavez-Rodriguez regarding her demeanor at meetings and being late to work, and that City Manager Mike Lujan in

May counseled Chavez-Rodriguez regarding inappropriate behavior.  See I Chavez-Rodriguez Dep. at 38:19-39:20, 58:20-23.  Chavez-Rodriguez admits these contentions.  The Defendants further contend that Chavez-Rodriguez was counseled on numerous other occasions, see, e.g., id. at 59:10-61:19, 106:1-8, but Chavez-Rodriguez contends that she was only counseled once and that she was subjected to false accusations from Lovato, see id. at 106:1-107:1.

The Defendants also contend that Heldmeyer observed problems in Chavez-Rodriguez' performance, including receiving complaints from constituents about the services that the Department of Senior Services offered, see Exhibit 12 to Retaliation Motion, Deposition of Karen Heldmeyer at 46:22-48:9 (taken February 29, 2008)(Doc. 151-4), and having difficulty in getting needed information from Chavez-Rodriguez, see id. at 33:9-13.  The Defendants also contend that Heldmeyer never sought Chavez-Rodriguez' removal.  See id. at 38:8-14.  Chavez-Rodriguez disputes these contentions, and maintains that Heldmeyer sought Chavez-Rodriguez' removal and that her observations of problems are mere pretext.  See, e.g., I Chavez-Rodriguez Dep. at 133:21-134:3 (stating that Heldmeyer had told people she wanted Chavez-Rodriguez stripped of her authority).

## PROCEDURAL BACKGROUND

The parties have filed five motions that in some way implicate Chavez-Rodriguez' First Amendment claim.  Thus, rather than deciding the motions seriatim, the Court must pull the related issues out of the motions and decide them.  Tenth Circuit First Amendment law indicates that the Court should decide certain issues before others.

### 1.      The Protected Speech Motion.

Chavez-Rodriguez moves the Court, in accord with rule 56 of the Federal Rules of Civil Procedure, for summary judgment in her favor and against the Defendants.  Chavez-Rodriguez

contends that there is no genuine issue of any material fact that she spoke out on a matter of public concern through protected speech following budget cuts that the Defendants made to the Division of Senior Services of the City of Santa Fe. Because of the dispositive nature of the motion, Chavez-Rodriguez did not seek concurrence from the Defendants' counsel. See Protected Speech Motion at 1. Chavez-Rodriguez maintains that the Court should render judgment for her because the pleadings, depositions, exhibits, and affidavits show that there is no genuine issue of material fact, and that she is entitled to judgment as a matter of law.

Chavez-Rodriguez argues that her speech involved a matter of public concern, because the budget cuts and transfers of funds would "cause the Division [of Senior Services] to be out of compliance with Federal law," and would "'seriously jeopardize the health and welfare of New Mexicans.'" Id. at 7-8 (quoting deposition). She also contends that some of her speech about the budget cuts was made, not as a public employee, but as private citizen. Specifically, she singles out her communications with the City Council and with individual Councilors, and her communications with the Speaker of the House, as being made outside the scope of her employment. See id. at 12.

On July 31, 2008, the Defendants filed a response in opposition to Chavez-Rodriguez' motion for partial summary judgment. See Response to Protected Speech Motion. The Defendants oppose Chavez-Rodriguez' motion for partial summary judgment, because, according to the Defendants, the legal precedent from the Supreme Court of the United States and the United States Court of Appeals for the Tenth Circuit establishes that her alleged speech regarding budget cuts to the Division of which she is Division Director, and comments regarding changes to the structure of the Division of Senior Services, were not speech or actions made by a private citizen, but were made pursuant to her official duties and therefore not protected speech under the First Amendment to the United States Constitution. See id. at 2. The Defendants also contend that there are numerous

-12-

disputed facts, that Chavez-Rodriguez is relying on facts that the record which she produced does not support, and that many facts are not material to the decision about the character of her speech. See id.

The Defendants assert that the proper order for considering whether a public employee's speech is protected is to begin with whether the employee's speech was as a private citizen or not, before turning to other factors. See id. at 10. They maintain that there is no evidence that Chavez-Rodriguez spoke to individual City Councilors, and that her communications to the City Council were part of the "express duties of her job description." Id. at 11. They also contend that Chavez-Rodriguez' talk with Lujan was during a banquet for several hundred senior-services volunteers that Chavez-Rodriguez was attending in her capacity as Director of Senior Services, and that, in this environment, her discussion of concerns about her division would not be protected speech. See id. at 12.

Chavez-Rodriguez filed her reply to the Defendants on August 7, 2008. See Plaintiff's Reply to Defendants' that Her Speech was on a Matter of Public Concern and Protected as a Matter of Law, filed August 7, 2008 (Doc. 145)("Reply for Protected Speech Motion."). Chavez-Rodriguez argues that the law on protected speech has more nuances than the Defendants' interpretations imply. See id. at 1. She maintains that she "was battling corruption from her supervisor, Ruben Lovato and the City Administration," and that such a context demonstrates that her speech was that of a citizen. Id. at 2. Furthermore, she contends that the City does not have an interest in efficiency that can outweigh her interests in unfettered speech. See id. at 2, 4.

## 2.   **The Pleadings Motion.**

On July 31, 2008, the Defendants moved pursuant to rule 12(c) for  judgment on the pleadings on Count I of the Complaint.  Most of the arguments raised in the motion are moot, as

-13-

Chavez-Rodriguez has conceded that much of her alleged speech is not protected under current law, and asserts that only her contact with the City Council, individual Councilors, and Lujan are protected. <u>See</u> Plaintiff's Response to Defendants' Motion for Judgment on the Pleadings on Count I of Plaintiff's Complaint (First Amendment Rights Under the United States and the New Mexico Constitutions) at 7, filed August 18, 2008 (Doc. 156). These issues are largely addressed in the Protected Speech Motion and related filings. The Court will consider the non-moot arguments that the parties raise in the Pleadings Motion and related filings in deciding the Protected Speech Motion. The Court will address the arguments on claims under the New Mexico Constitution in a separate memorandum opinion and order.

### 3.    <u>Adverse Action Motion and Motion to Strike</u>.

On April 4, 2008, Chavez-Rodriguez moved the Court to grant summary judgment in her favor because there was no genuine issue of material fact that she had suffered a materially adverse employment action. <u>See</u> Adverse Action Motion at 1. On April 16, 2008, the Defendants moved the Court to strike the Adverse Action Motion. <u>See</u> Motion to Strike at 1. At the hearing on September 25, 2008, the Court denied the Motion to Strike and gave the Defendants ten days to respond to the Adverse Action Motion. <u>See</u> Transcript of Hearing at 50:19-24 (Court)(taken September 25, 2008)("September Tr.").[1] The Court then heard argument from the parties regarding the Adverse Action Motion. The Defendants filed their response after the hearing. <u>See</u> Defendants' Response in Opposition to Plaintiff's Motion [for] Summary Judgment that She Suffered a Materially Adverse Employment Action, filed October 2, 2008 (Doc. 207)("Response to Adverse Action Motion"). The Court heard further argument on the motion at the hearing on October 7,

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

2008.  As the parties note, there is considerable overlap between the Adverse Action Motion and the Retaliation Motion.  Accordingly, the Court will consider the arguments raised in those two motions together in its analysis.

In her motion, Chavez-Rodriguez argues that she suffered an adverse employment action and that "there is no genuine issue of material fact on the question of the liability of the City."  Adverse Action Motion at 4-5.  She maintains that, on a Friday morning, January 19, 2007, she received a phone call from Hiatt telling her that "she was no longer Director of Senior Services" and should "report to the Genoveva Chavez Community Center the following Monday to report to her new job as Senior Activity Planner/Outreach Coordinator."  Id. at 4.  She states she took sick and annual leave, filed a grievance, and was reinstated as Director five weeks later.  See id.  She argues that Hiatt's call was a transfer to an entry-level position after twenty-two years of service with the City, and that any reasonable employee would have found the transfer to be materially adverse.  See id. at 5.

The Defendants contend that no final decision had been made regarding Chavez-Rodriguez' transfer, until she "forced the issue" by declaring at a meeting that there was going to be a reorganization, and she would not be Director any longer.  See Response to Adverse Action Motion at 7.  They argue that Chavez-Rodriguez "did not express to the board that she was being transferred in retaliation for speaking out."  Id. at 8.  Moreover, they contend that the transfer was proposed, but never actually implemented.  See id. at 9.  Finally, the Defendants argue that, regardless how the Court decides the transfer issue, Chavez-Rodriguez is not entitled to summary judgment on the issue of liability because she has not established the other elements of her claim.  See id. at 10.

### 4. **Retaliation Motion.**

On August 11, 2008, the Defendants moved the Court for summary judgment on the First

Amendment claim in Count I of the Complaint.  See Retaliation Motion at 1.  In their motion, the Defendants challenge Chavez-Rodriguez' case on two grounds: (i) that many of the acts which she alleges were retaliatory are not sufficiently adverse to be actionable under the First Amendment; and (ii) that  she is not able to show a causal connection between her speech and many of the alleged retaliatory acts.  The Defendants argue that some of the allegations in the Complaint fail on the first ground, others on the second, and some on both.

The Defendants argue that the Chavez-Rodriguez' alleged protected speech was too remote from the alleged acts of retaliation to allow an inference that the speech was a factor in the alleged retaliation.  See id. at 16-18 (errata).[2]  They identify two periods, 2004 through spring of 2005, and April to October of 2006, as being periods in which Chavez-Rodriguez allegedly engaged in protected speech.  See id.  The Defendants then proceed to address various incidents that Chavez-Rodriguez alleged to have been retaliatory.  First, the Defendants submit that Chavez-Rodriguez' allegation that Hiatt swung a baseball bat in her direction, given that three eyewitnesses contradict her, "is so fantastic as to not merit credence."  Id. at 18 (errata).  Moreover, they argue there is "only the slimmest temporal proximity" to connect the incident with any of Chavez-Rodriguez' protected speech.  Id.  Second, the Defendants maintain that Chavez-Rodriguez was never actually transferred, that Coss and Heldmeyer had nothing to do with the proposed transfer, and that Hiatt had valid

_____

[2] The Defendants filed corrections to their Retaliation Motion.  See Errata to Defendants' Motion and Memorandum in Support of Partial Summary Judgment on First Amendment Retaliation (Count I)[Doc. 151], filed August 12, 2008 (Doc. 152)(brackets in original); Errata #2 to Defendants' Motion and Memorandum in Support of Partial Summary Judgment on First Amendment Retaliation (Count I)[Doc. 151], filed August 20, 2008 (Doc. 157)(brackets in original).  These corrections relate to minor errors on pages 16 to 18, and 11 to 13, respectively, of the Retaliation Motion. When the Court refers to those page numbers, it will indicate that it refers to the corrected version via "errata" in a parenthetical.  The second errata also added underlining to deposition testimony, but because that does not change the substance of the documents, the Court does not indicate when it refers to the corrected deposition testimony.

reasons for his actions.  See id. at 18-21 (errata).

The Defendants next address four incidents involving Coss and primarily argue that none of the incidents were adverse enough to qualify as adverse employment actions.  They maintain that Coss did not lie to Lujan about Chavez-Rodriguez' views on the separation of County and City services because he believed that she supported the separation.  See id. at 21.  They also maintain that Coss saying Chavez-Rodriguez "will get hers" is speech and not an action against an employee, and is double hearsay besides.  See id.  They argue that Coss not responding to a written request for a meeting, and sending people to represent Santa Fe at a meeting with New Mexico's Aging and Long Term Care Department while Chavez-Rodriguez was on leave are not adverse employment actions.  Id. at 21-22.  Finally, they contend that Chavez-Rodriguez has no admissible evidence showing that Coss had an employee in her division reclassified as part-time without her involvement.  Id. at 22.

The final incidents the Defendants discuss involve Heldmeyer.  They argue that Chavez-Rodriguez' contention that Heldmeyer told Lovato that she wanted Chavez-Rodriguez "transferred to a community center where she could 'use her pretty little smile at the front desk to greet people'" is inadmissible double hearsay, and an isolated statement that did not result in any actions against Chavez-Rodriguez.  Id.  Similarly, the Defendants contend that Heldmeyer's statement that she found Chavez-Rodriguez "difficult to deal with is merely a statement of fact."  Id.  The Defendants also argue that Heldmeyer's attending a meeting unannounced was not harassment because she had the authority to do so, and that her asking "questions of seniors which the Division had already answered" was also not an adverse action.  Id. at 22-23.  The Defendants also assert that Heldmeyer's "displeasure at [Chavez-Rodriguez'] communication with an outside agency" was not an action against her.  Id. at 23.  Finally, the Defendants contend that, regardless whether Heldmeyer

wanted Chavez-Rodriguez removed from her position, she never sought to do so.  See id.

Chavez-Rodriguez responded to the Defendants' motion on September 3, 2008.  See Memorandum in Support of Plaintiff's Response to Defendants' Motion and Memorandum in Support of Partial Summary Judgment on First Amendment Retaliation (Count I), filed September 3, 2008 (Doc. 171)("Response to Retaliation Motion").  She incorporated by reference her arguments in the Adverse Action Motion, dealing with her alleged transfer.  See id. at 6.

Chavez-Rodriguez argues that she is not relying on mere temporal proximity to prove that her protected speech was a significant factor in the Defendants' alleged retaliatory acts.  Rather, she contends that a number of statements that the Defendants made reveal that they harbored a desire to remove Chavez-Rodriguez from her position.  For instance, she maintains that Coss' deposition demonstrates he knew that Rodriguez had discussions with Lujan or someone in his office, and that, upon exiting a Council meeting, he told Len Montoya, who at the time was the head of the Santa Fe branch of the American Federation of State, County, and Municipal Employees, "Patricia made me feel like a punk.  Wait until I get elected Mayor, she'll get hers."  Id. at 13.

Chavez-Rodriguez also deals with the particular incidents the Defendants addressed in their motion.  Regarding Hiatt's allegedly swinging a baseball bat in her direction, Chavez-Rodriguez notes that her testimony establishes that he left his desk and swung it toward her, and that she was afraid he would hit her.  See id. at 14-16.  Regarding the transfer, she argues that Lovato told her that Coss and Heldmeyer wanted her out, and that she had received satisfactory performance reviews up until her removal.  See id. at 18-19.  Chavez-Rodriguez also argues that Coss and Heldmeyer's actions rise to the level of being adverse actions.

The Defendants replied, arguing that Chavez-Rodriguez had failed to offer much more than inadmissible hearsay and self-serving testimony in support of her arguments.  See Reply to

Plaintiff's Response [Doc. 170] to Defendants' Motion for Partial Summary Judgment on First Amendment Retaliation (Count I) [Doc. 151] at 3-7, filed September 22, 2008 (Doc. 190)("Reply for Retaliation Motion")(brackets in original). Chavez-Rodriguez, the Defendants assert, has for the most part failed to show that the Defendants were aware of her protected speech. See id.

The Defendants also argue that Chavez-Rodriguez' Complaint and testimony indicate that Hiatt swung a baseball bat "in the direction of" Chavez-Rodriguez, but not at her. Id. at 8. Moreover, they argue that there is no evidence that Hiatt's swinging the bat was retaliatory, but that the record demonstrates Chavez-Rodriguez' lack of professionalism. See id. at 8-10. They also note that, while Chavez-Rodriguez argues that there was a close temporal relationship between Coss and Heldmeyer learning of Chavez-Rodriguez' speech at a budget meeting, the proper measure is the time between the protected activity and the alleged retaliation, which is a gap of one and a half years. See id. at 10-11. The Defendants argue that Chavez-Rodriguez' reliance on recorded conversations with Lovato and Montoya's affidavit cannot stave off summary judgment because they consist of speculation or are unclear about whom they reference. See id. at 12-13 (errata). Ultimately, they conclude, what the record shows is that Lovato and Hiatt attempted to have Chavez-Rodriguez transferred because of problems with her job performance, all without any instigation or input from Coss or Heldmeyer. See id. at 14-15.

   **5.   The Hearings.**

At the first hearing on September 25, 2008, the Court heard argument on all five motions at issue here, although it did not hear complete argument on the Retaliation Motion. The Defendants stated that they filed their Motion to Strike because it was unclear to what cause of action the Adverse Action Motion relates, and whether Chavez-Rodriguez was making a Title VII claim. See September Tr. at 47:21-48:6. The Defendants also believed that the Adverse Action Motion

inappropriately forced them to scour the record because the motion did not have all the necessary excerpts from the record attached.  See id. at 48:7-17 (Hoffman).  At the hearing, it was clear that the Adverse Action Motion related to Chavez-Rodriguez' claim of First Amendment retaliation, and the Defendants suggested that the these issues were briefed in the Retaliation Motion.  See id. 49:1-7 (Hoffman).  The Court stated that it would deny the Motion to Strike.  See id. at 50:15-16 (Court). The Court gave the Defendants ten days to file a response to the Adverse Action Motion.  See id. at 50:22-51:3 (Court).

        The parties then addressed the Adverse Action Motion.  Chavez-Rodriguez stated that, soon after Coss became mayor, Lovato became her supervisor, and immediately began harassing her and making her job more difficult.  See id. at 52:10-53:4 (O'Friel).  She stated that she was informed she would be removed and was given a job description for her new job in June of 2007.  See id. at 53:5-8 (O'Friel).  She contends that, ultimately, on January 19, 2007, she was told to clean out her desk and report on Monday to a new position.  See id. at 54:8-20.  Chavez-Rodriguez admitted she had not suffered a reduction in salary.  See id. at 55:7-8 (O'Friel).  Although the Defendants had not filed a response at this time, they did argue in opposition to the motion, noting that much of the evidence that Chavez-Rodriguez relied on came from surreptitious tape recordings made with a small recorder she carried with her, and that many of the statements were taken out of context, as they were tiny portions of long, personal conversations.  See id. at 59:14-61:5 (Hoffman).  After hearing the remainder of the arguments on the motion, the Court indicated that it would consider the Defendants' response once it was submitted, but that it was inclined to grant Chavez-Rodriguez' motion in part because there was a genuine issue of material fact whether the transfer had occurred, but that the transfer would be materially adverse if the transfer did occur.  See id. at 69:17-70:14 (Court).

The Court then heard argument on the Protected Speech Motion and the Pleadings Motion together.  See id. at 70:20-71:4 (Court).  In response to the Court's question, the Defendants stated that they were relying on Garcetti v. Ceballos and agreed that Chavez-Rodriguez' speech was on a matter of public concern.  See id. at 78:15-21 (Court, Hoffman).  The Court also heard some argument from the Defendants on their Retaliation Motion, but was unable to finish hearing that motion at the time, and suggested that the Court resume hearing argument at the forthcoming pretrial conference.  See id. at 177:25-178:1 (Court).

On October 7, 2008, the Court held a pretrial conference and motion hearing, at which it heard additional argument on the Adverse Action Motion and Retaliation Motion.  In between the September 25, 2008, hearing and the October 7, 2008, hearing, the Defendants had filed their response to the Adverse Action Motion, and the Court heard more argument on that motion.  See Transcript of Hearing at 2-13 (taken October 7, 2008)("October Tr.").[3]  The Court then heard counsels' remaining arguments on the Retaliation Motion, including the Defendants' argument that Hiatt and Lovato would have attempted to transfer Chavez-Rodriguez regardless of any protected speech because of problems with her job performance.  See id. at 21:13-23:15 (Hoffman).

## LAW REGARDING FIRST AMENDMENT RETALIATION CLAIMS

The Supreme Court's most recent pronouncement on a government employee's First Amendment rights requires the Court to first determine whether the plaintiff spoke as an employee or as a citizen.  Only then does the Court turn to the question whether the speech involves a matter of public concern, and whether the employee's interest in the speech outweighs the government employer's interest in regulating the speech.  Only after the Court decides that the speech is

---

[3] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

-21-

protected does it need to consider whether the government employer has taken a materially adverse action, and that there is a connection between the protected speech and the adverse action.

### 1.    **Speaking as a Private Citizen.**

For almost four decades, <u>Pickering v. Bd. of Education of Township High School Dist. 205, Will County, Illinois</u>, 391 U.S. 563 (1968), was the leading case on the First Amendment rights of public employees.  The Supreme Court held that, while "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," the ultimate test required balancing the interest of the public employee "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  391 U.S. at 568.

In 2006, the Supreme Court made a significant change to the First Amendment landscape in <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006).  The Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  <u>Id.</u> at 421.

In the aftermath of <u>Garcetti v. Ceballos</u>, the Tenth Circuit has fashioned a five-part test ("the <u>Garcetti/Pickering</u> analysis") to determine when a public employee has a cause of action for retaliation under the First Amendment:

> First, the court must determine whether the employee speaks "pursuant to [his] official duties." <u>Garcetti</u>, 126 S.Ct. at 1960; <u>see also</u>  Mills [v. City of Evansville, Indiana], 452 F.3d [646] at 647 [(7th Cir. 2006)] ("<u>Garcetti</u> . . . holds that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen'. . . ."). If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech "simply reflects the exercise of employer

control over what the employer itself has commissioned or created." Garcetti, 126 S.Ct. at 1960. Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. See Green v. Bd. of County Commr's, 472 F.3d 794, 798 (10th Cir. 2007); Mills, 452 F.3d at 647-48. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a "substantial factor or a motivating factor in [a] detrimental employment decision." Lybrook [v. Members of Farmington Mun. Schools Bd. of Education], 232 F.3d [1334] at 1338 [(10th Cir. 2000)] (internal quotation marks omitted). Finally, if the employee establishes that his speech was such a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." Id. at 1339 (internal quotation marks omitted). The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact. See Cragg v. City of Osawatomie, 143 F.3d 1343, 1346 (10th Cir. 1998).

Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192, 1202-03 (10th Cir. 2007).

Elaborating on what constituted speech by a government employee pursuant to official duties, the

Tenth Circuit stated:

However, cases interpreting Garcetti have made clear that speech relating to tasks within an employee's uncontested employment responsibilities is not protected from regulation. See, e.g., Casey, 473 F.3d at 1329 (noting that when the speech concerns a matter within the employee's "portfolio" it is made "pursuant to her official duties"); see also Wilburn v. Robinson, 480 F.3d 1140, 1151 (D.C.Cir. 2007) (same). This may be true even though the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions. See Battle v. Bd. of Regents, 468 F.3d 755, 761 n. 6 (11th Cir. 2006) (per curiam). Indeed, we have stated that speech is made pursuant to official duties if it is generally consistent with "the type of activities [the employee] was paid to do." Green, 472 F.3d at 801.

An employee's official job description is not dispositive, however, because speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform. The ultimate question is whether the employee speaks as a citizen or instead as a government employee – an individual acting "in his or her professional capacity." See Garcetti, 126 S.Ct. at 1960. Consequently, if an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the

-23-

employee's performance of the official duty, the speech is made pursuant to the employee's official duties. <u>See</u> <u>Williams v. Dallas Indep. Sch. Dist.</u>, 480 F.3d 689, 693 (5th Cir. 2007) (per curiam). At the same time, not all speech that occurs at work is made pursuant to an employee's official duties. <u>See</u> <u>Garcetti</u>, 126 S.Ct. at 1959 ("Employees in some cases may receive First Amendment protection for expressions made at work."). Nor is all speech about the subject matter of an employee's work necessarily made pursuant to the employee's official duties. <u>Id.</u> at 1959 ("The First Amendment protects some expressions related to the speaker's job."). Instead, we must take a practical view of all the facts and circumstances surrounding the speech and the employment relationship. <u>Id.</u> at 1961 ("The proper inquiry is a practical one.").

<u>Brammer-Hoelter v. Twin Peaks Charter Academy</u>, 492 F.3d at 1203-04.

Because of the recent vintage of <u>Garcetti v. Ceballos</u>, the Tenth Circuit has not created a substantial body of law dealing with when public employees act pursuant to their duties. Additionally, the test is a practical one, and involves a comprehensive facts-and-circumstances inquiry. Accordingly, it is useful to consider the facts of the handful of cases where the Tenth Circuit has explored the reach of the new rule in depth.

The plaintiffs in <u>Brammer-Hoelter v. Twin Peaks Charter Academy</u> were a group of teachers who had worked at the Academy, a Colorado charter school. One year after the Academy had opened its doors, they had "developed a number of concerns or grievances about the operation, management, and mission of the Academy." 492 F.3d at 1199. The plaintiffs would "meet off-campus and after hours at restaurants, in each others' homes, and at least once at a church to discuss" their concerns. <u>Id.</u> Although the Academy's principal ordered them "not to discuss Academy matters outside of work with any person, including each other," they continued meeting off-campus. <u>Id.</u> Several of the meetings were attended by parents of Academy schoolchildren and other members of the public, and the teachers held some twenty to twenty-five meetings in all. <u>See</u> <u>id.</u> The teachers received poor performance evaluations and stated that the principal became very hostile to them, ultimately leading to their resignation en masse. <u>See</u> <u>id.</u> at 1200.

-24-

The Tenth Circuit considered forty-four or more different matters about which the teachers had spoken, but decided that most of the speech was pursuant to their roles as teachers, as it related to issues such as curriculum and student discipline.  See id. at 1204.  Twelve matters, however, were found to be outside the scope of their duties:

> (1) the resignations of other teachers, (2) whether the Academy Code of Conduct could restrict Plaintiffs' freedom of speech, (3) staffing levels, (4) the Academy's spending on teacher salaries and bonuses, (5) criticisms of the school board, (6) the visibility of Dr. Marlatt [principal of the Academy] and the Board at important events, (7) the lack of support, trust, feedback and communication with Dr. Marlatt, (8) Dr. Marlatt's restrictions on speech and association, (9) the treatment of parents by the Board, (10) Dr. Marlatt's favoritism, (11) whether the Academy charter would be renewed, and (12) the upcoming Board elections.

Id. at 1204-05.  The Tenth Circuit distinguished these particular matters, stating:

> As teachers, Plaintiffs had no supervisory responsibility and no duty to report with regard to any of the problems being discussed, nor does it appear that Plaintiffs' discussion of these matters occurred during the performance of their official duties because the discussions occurred after hours and outside of the Academy. Furthermore, the discussions included ordinary citizens and parents who were not employed by the Academy. Consequently, these twelve matters discussed by Plaintiffs pass the first step of the Garcetti/Pickering analysis.

Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1205.

In Casey v. West Las Vegas Independent School Dist., 473 F.3d 1323 (10th Cir. 2007), the Tenth Circuit considered a school superintendent's voicing concerns over various practices in her district.  The superintendent's job included acting as the chief executive officer of the local Head Start program.  See id. at 1325.  Casey, the superintendent, brought a number of matters to the West Las Vegas School Board's attention, including "evidence that as many as 50% of the families enrolled in the District's Head Start program appeared to have incomes that were too high for them to qualify for participation."  Id. at 1326.  She "also informed the Board that it was violating the New Mexico Open Meetings Act by making personnel and other decisions in executive session

without proper notice and meeting agendas." Id.  Despite repeated attempts, the Board refused to take action on the issues, and Casey directed an employee to contact the regional Head Start office about that program, while she contacted the New Mexico Attorney General's office about the Open Meetings Act allegations.  See id.  Not long after the Attorney General's office wrote to the Board requesting a response to Casey's accusation, the Board demoted her to assistant superintendent, and later unanimously agreed to not renew her contract.  See id. at 1327.  Casey then filed suit.  See id.

The Tenth Circuit held that Casey's contacting the Head Start office was pursuant to her job responsibilities.[4]  Under federal regulations, individuals "with knowledge of financial irregularities risked civil and criminal liability by remaining silent in the face of such knowledge." Id. at 1330. "Ms. Casey effectively acknowledged [this risk], conceding that her responsibilities 'as executive director' included a duty to report the District's noncompliance to federal authorities." Id. (citation omitted).  The Tenth Circuit found it "notable that Ms. Casey acted not on her own in this matter, but thought it sufficiently a part of her job duties to report the District's financial irregularities . . . that she deemed it appropriate to order a subordinate . . . to contact Head Start officials." Id. at 1331.  The Tenth Circuit stated, however, that its holding was not meant "to suggest that every agent who disregards a principal's instructions not to disclose information is barred from suit by Garcetti." Id.

In contrast to her activities involving the Head Start program, the Tenth Circuit held that Casey's communications with the Attorney General's office were undertaken as a private citizen. While she had a duty to advise the Board, she was not fulfilling that responsibility by going to the Attorney General.  See id.  "Just the opposite: she had lost faith that the Board would listen to her

---

[4] The contact was through an employee who Casey had hired to oversee the Head Start program, but the employee was acting under Casey's orders.

advice so she took her grievance elsewhere." Id. The Tenth Circuit acknowledged that she had also gone to outside authorities regarding the Head Start program, but noted:

> [U]nlike the administration of the Head Start program that the Board committed to her care and pursuant to which she had independent responsibilities to the federal government, we have no evidence in the summary judgment record before us suggesting that the Board or any other legal authority ever assigned Ms. Casey responsibility for the Board's meeting practices.

Id.

Green v. Bd. of County Com'rs, 472 F.3d 794 (10th Cir. 2007), involved a drug laboratory technician who said she was wrongfully terminated because she had advocated for the laboratory's adoption of a confirmation-testing policy to avoid false positives of drug use. See id. at 796. Green, the technician, had raised concerns over the laboratory's lack of a confirmation-testing policy. See id. On behalf of a client, she had talked with an equipment manufacturer and arranged with an outside hospital to do a confirmation test. See id.

The Tenth Circuit examined the laboratory technician's job description, "keeping in mind that inclusion of a job duty in a formal job description 'is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.'" Id. at 800 (quoting Garcetti v. Ceballos, 547 U.S. at 425.). Her activities were not explicitly covered by her job description, but her "job duties required her to 'work closely' with drug lab clients, the equipment manufacturer, and various governmental agencies." Green v. Bd. of County Com'rs, 472 F.3d at 800 (citation omitted). The Tenth Circuit concluded that "Ms. Green was not communicating with newspapers or her legislators or performing some similar activity afforded citizens; rather, even if not explicitly required as part of her day-to-day job responsibilities, her activities stemmed from and were the type of activities that she was paid to do." Id. at 800-01.

2.    **Adverse Actions.**

Under the fourth factor in the <u>Garcetti/Pickering</u> analysis, "the employee must show that his

speech was a 'substantial factor or a motivating factor in [a] detrimental employment decision.'"

<u>Brammer-Hoelter v. Twin Peaks Charter Academy</u>, 492 F.3d 1192 at 1203 (quoting <u>Lybrook v.</u>

<u>Members of Farmington Mun. Schools Bd. of Education</u>, 232 F.3d at 1338)(brackets in original).

"The circuits are split as to what may constitute adverse employment action[5] in the context of a First

Amendment claim."  <u>Maestas v. Segura</u>, 416 F.3d 1182, 1188 n. 5 (10th Cir. 2005).  The Tenth

Circuit has stated

> that some forms of retaliation may be actionable under the First Amendment while
> insufficient to support a discrimination claim under Title VII. <u>See</u> <u>Baca [v. Sklar]</u>,
> 398 F.3d [1210] at 1220 [(10th Cir. 2005)]; <u>Wells v. Colorado Dept. of Transp.</u>, 325
> F.3d 1205, 1220 (10th Cir. 2003).  In <u>Schuler v. City of Boulder</u>, 189 F.3d 1304,
> 1309 (10th Cir. 1999), we recognized that retaliation involving "promotion, transfer,
> recall after layoff, and hiring decisions" may be actionable under the First
> Amendment "although not amounting to termination of employment or the
> substantial equivalent of dismissal."  That is as far as we have gone. Unlike the
> Seventh Circuit, we have never held employment action which may tend to chill free
> speech is necessarily adverse.  <u>See</u> <u>Baca</u>, 398 F.3d at 1220.

<u>Maestas v. Segura</u>, 416 F.3d at 1188 n. 5.  Because the issue of what exactly constituted an adverse

employment action was not necessary to the case, the Tenth Circuit decided "to leave that question

for another day."  <u>Id.</u>

In <u>Brammer-Hoelter v. Twin Peaks Charter Academy</u> the Tenth Circuit, after noting that it

had "never established a general rule for determining what adverse employment actions may

suffice," elaborated some on the standard for adverse employment actions in First Amendment

---

[5] The Tenth Circuit has, in the First Amendment context, used "detrimental employment decision" and "adverse employment action" interchangeably.  <u>Compare</u> <u>Lybrook v. Members of Farmington Mun. Schools Bd. of Education</u>, 232 F.3d at 1338 <u>with</u> <u>Maestas v. Segura</u>, 416 F.3d at 1188 n. 5.

cases:

> [I]n Morfin [v. Albuquerque Pub. Schs.], we implied that "substantial harassment and abuse" could be a sufficient adverse employment action for First Amendment purposes. See 906 F.2d [1434] at 1437 [(10th Cir. 1990)]; see also Schuler, 189 F.3d at 1309 (analyzing Morfin). We have also held that First Amendment retaliation claims can be based on removing job duties from an employee's portfolio or giving an employee a written reprimand or a poor performance rating. Id. at 1310; see also Baca v. Sklar, 398 F.3d 1210, 1220-21 (10th Cir. 2005) (noting that a First Amendment retaliation claim may be based on "repercussions that would not be actionable under Title VII").

Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1208.

In Baca v. Sklar, the Tenth Circuit found that removing supervisory responsibilities, depriving a supervisor of the opportunity to supervise a person he or she recruited, encouraging employees to bypass that supervisor, making reprimands in contravention of policy, and filing employment charges are all actions that "could be found to constitute adverse employment actions in the First Amendment context." 398 F.3d at 1221.

**3.    Causation.**

The second half of the fourth part of the Garcetti/Pickering analysis requires a showing that the plaintiff's protected speech was a "'substantial factor or a motivating factor'" in the adverse action. Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192 at 1203 (quoting Lybrook v. Members of Farmington Mun. Schools Bd. of Education, 232 F.3d at 1338). Demonstrating this link is a fact-intensive inquiry and is thus ordinarily the jury's province. See Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192 at 1203. Nonetheless, "[t]o withstand summary judgment . . . an employee must produce evidence linking the employer's action to the employee's speech." Maestas v. Segura, 416 F.3d at 1188.

The Tenth Circuit summarized some of the law regarding causation in First Amendment cases in Maestas v. Segura:

Adverse action in close proximity to protected speech may warrant an inference of retaliatory motive. See Baca, 398 F.3d at 1221. But temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision. Id[.]; see also Morfin v. City of East Chicago, 349 F.3d 989, 1005 (7th Cir. 2003) (explaining protected conduct cannot be a basis for retaliation where defendants did not know of such conduct). An employer's knowledge of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment. See Ramirez [v. Oklahoma Dep't of Mental Health], 41 F.3d [584] at 596 [(10th Cir. 1994)]. Other evidence of causation may include evidence the employer expressed opposition to the employee's speech, see Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 929 (9th Cir. 2004), or evidence the speech implicated the employer in serious misconduct or wrongdoing.  See Baca, 398 F.3d at 1221. On the other hand, evidence such as a long delay between the employee's speech and challenged conduct, see McGuire v. City of Springfield, 280 F.3d 794, 796 (7th Cir. 2002), or evidence of intervening events, see Gubitosi v. Kapica, 154 F.3d 30, 33 (2d Cir. 1998), tend to undermine any inference of retaliatory motive and weaken the causal link.

Maestas v. Segura, 416 F.3d at 1189.

Showing that an adverse action occurred in close proximity to protected speech is a common method of showing causation.  A plaintiff need not show proximity between the protected speech and an action sufficiently severe to be materially adverse, but can instead show temporal proximity between the speech and the beginning of a pattern of retaliatory activity, some instances of which are sufficient under the Garcetti/Pickering analysis.  As the Tenth Circuit has stated in another context:

We have recognized that protected conduct closely followed by adverse action may justify an inference of retaliatory motive. See Love v. Re/Max of Am., Inc., 738 F.2d 383, 386 (10th Cir. 1984) (Title VII judgment upheld based in part on adverse action closely following protected activity). Although we have rejected attempts to unduly stretch the "close temporal proximity" required under this standard, see Candelaria v. EG & G Energy Measurements, Inc., 33 F.3d 1259, 1262 (10th Cir. 1994), and cases cited therein, we also believe that the phrase "closely followed" must not be read too restrictively where the pattern of retaliatory conduct begins soon after the filing of the FLSA complaint and only culminates later in actual discharge. Cf. Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 377 n. 4 (6th Cir. 1984) (reversing judgment for defendant and remanding for further consideration of Title VII retaliation claim where discharge occurred nearly one and one-half years after

complaint but pattern of retaliation allegedly began soon after complaint was filed).

Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996).  This reasoning has been cited

approvingly in First Amendment cases.  See Baca v.Sklar, 398 F.3d at 1221.

## ANALYSIS

There are multiple motions before the Court, addressing various elements of Chavez-Rodriguez' claims, but all the motions revolve around one concept: which, if any, claims of retaliation under the First Amendment for engaging in protected speech should go to a jury for decision.  In accordance with the rule laid down by the Supreme Court and the Tenth Circuit, the Court first considers whether any instance of Chavez-Rodriguez' speech was undertaken pursuant to her duties as Director of Senior Services.  See Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1203 ("'[B]efore asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen.'")(quoting Mills v. City of Evansville, Indiana, 452 F.3d at 647).  The Court concludes that Chavez-Rodriguez was acting in the course of her duties in her communications with the City Council and individual Council members, but was speaking as a citizen in her discussion with Lujan at a volunteer banquet.

Because Chavez-Rodriguez was speaking as a citizen when she spoke to Lujan, the Court must then consider the traditional four Pickering factors.  The first two factors in the analysis – factors two and three in the Garcetti/Pickering analysis – are whether Chavez-Rodriguez' speech was on a matter of public concern, and whether her interest in the speech outweighed the City's interest as an employer in regulating it.  See Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1202.  The parties have not addressed these issues, and the Defendants have conceded that Chavez-Rodriguez' speech was on a matter of public concern.  See id. at 78:15-21 (Court, Hoffman). Because of this concession, and because the Defendants do not challenge Chavez-Rodriguez' case

on the grounds that her employer had a superior interest, and given that there is little, if any, evidence in the record that her speaking with Lujan was disruptive enough to warrant the City's regulating it, the Court will consider that the second and third factors of the Garcetti/Pickering test have been met.

The fourth factor is principally an issue of fact for the jury to decide.  See Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1203. The fourth factor also has two parts.  Chavez-Rodriguez must show sufficient evidence to create a triable issue that she has suffered at least one materially adverse employment action, and that her protected speech was a substantial reason for that action.  The Court concludes that, if true, Chavez-Rodriguez' being transferred, Hiatt's swinging a baseball bat in her direction, and other actions, are materially adverse employment actions, and that there is a genuine dispute of material fact about them.  The Court also concludes that there is sufficient evidence that a jury could find that Chavez-Rodriguez' protected speech was a substantial reason for those materially adverse actions.

Under the fifth and final factor in the Garcetti/Pickering analysis "'the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.'"   Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1203 (quoting Lybrook v. Members of Farmington Mun. Schools Bd. of Education, 232 F.3d at 1339). This is also principally an issue for the jury.  See Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1203.  While the Defendants have raised the defense of the fifth factor to some extent, they have not eliminated the possibility that there is an issue of fact; given that there is evidence that protected speech was a factor in the Defendants' actions, the issue is ultimately one for the jury to resolve.  See Baca v. Sklar, 398 F.3d at 1222 (finding that plaintiff's facts supporting causation "suffice to create a fact issue about whether the defendants would have reached the same decision

regardless of [plaintiff's] statements.").

I.      **SOME OF CHAVEZ-RODRIGUEZ' SPEECH IS PROTECTED AS A MATTER OF LAW.**

Following the Supreme Court's ruling in <u>Garcetti v. Ceballos,</u> Chavez-Rodriguez faces a heavy burden to establish that her speech in opposition to the proposed budget cuts is protected as a matter of law. The first step is whether Chavez-Rodriguez was speaking as a private citizen or as a public employee in her discussions over budgeting and funding. Chavez-Rodriguez concedes that two classes of activities in which she engaged – (i) communicating with her department head and the Santa Fe City Manager; and (ii) communicating with federal agencies – were part of her official job duties and were not protected speech. <u>See</u> Protected Speech Motion at 11-12. She maintains that two other sets of communication, however, were not made pursuant to her duties: (i) statements made to the City Council and individual City Councilors; and (ii) statements made to Lujan. <u>See</u> <u>id.</u> at 12. The Court agrees with Chavez-Rodriguez regarding the latter statements, but concludes that her interactions with the City Council were part of her duties and thus were not made as a "citizen."

A.      **CHAVEZ-RODRIGUEZ WAS NOT SPEAKING AS A CITIZEN WHEN SHE TALKED WITH THE CITY COUNCIL AND INDIVIDUAL MEMBERS OF THE COUNCIL.**

The Director of Senior Services for the City of Santa Fe has a number of duties, including conducting "an on-going evaluation of all programs," and reporting "to funding sources and to the city governing body regarding progress and concerns." Exhibit A to Notice of Removal, Complaint to Recover Damages for Violations of Rights Guaranteed by the United States Constitution and the New Mexico Constitution, Assault, Punitive Damages, Attorney's Fees and Costs ¶ 8, at 3, filed July

-33-

2, 2007 (Doc. 1-2)("Complaint").[6]  The division which the Director of Senior Services oversees has

"multiple city, state, federal, and county funding sources."  Id. ¶ 8, at 2.  The governing body for the

City of Santa Fe is the Santa Fe City Council.  Given these duties, Chavez-Rodriguez' discussions

with the City Council and Councilors would have been pursuant to her obligations to evaluate

programs within her division and report to the City Council about concerns she might have and

about the progress of the division.  Accordingly, they would not be communications made as a

private citizen and are not protected speech under the First Amendment, and the Court will enter

judgment in favor of the Defendants on this point.[7]

_____

[6] The Court cites to the Complaint for a description of the duties of the Director of Senior Services because it is the only description in the record of which the Court is aware.  The Defendants use the Complaint in their briefing for this purpose, apparently agreeing with Chavez-Rodriguez' description of her job, and Chavez-Rodriguez does not cite to anything when discussing what her duties are.

[7] Technically, the Defendants have moved only to dismiss Count I of Chavez-Rodriguez' Complaint; while they opposed the Protected Speech Motion, they did not cross-motion for summary judgment.  See Response to Protected Speech Motion at 2.  The Court believes that it is appropriate, however, to convert the Pleadings Motion to a rule 56 motion and grant summary judgment to the Defendants.  Chavez-Rodriguez relied on her Protected Speech Motion in responding to the Pleadings Motion, see Response to Pleadings Motion at 7, which involved material outside the pleadings, and also relied on material outside the pleadings at the hearing, see September Tr. at 85:22-86:15 (O'Friel).  Because the Court considered materials outside the pleadings, it will treat the Pleadings Motion as a motion for summary judgment.  See, e.g., Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007).  Normally, notice and opportunity to present material must be given of such a conversion.  See, e.g., Fed. R. Civ. P. 12(d).  On the Pleadings Motion, however, the non-moving party is the party introducing the additional material and the Court is nonetheless granting summary judgment to the moving party.  Moreover, both parties have presented relevant affidavits and deposition testimony in the context of the Protected Speech Motion.  Accordingly, notice is not necessary.  Additionally, the Court "can grant summary judgment to a nonmoving party if the relevant facts are undisputed and the party is entitled to a judgment as a matter of law."  E.g., Allstate Ins. Co. v. Patterson, 904 F.Supp. 1270, 1274 (10th Cir. 1995)(citing Dickeson v. Quarberg, 844 F.2d 1435, 1444 n. 8 (10th Cir. 1988)).  Thus, the Court could alternately grant summary judgment to the Defendants on the Protected Speech Motion despite their failure to formally cross-motion for summary judgment.  Ultimately, in these circumstances, where both sides have thoroughly briefed and argued the legal and factual issues, the Court does not see any prejudice in granting summary judgment to the Defendants on this point.

The case law has generally held that comments about employment-related concerns to supervisory officials or bodies are actions taken as an employee, and not as a citizen. See, e.g., Garcetti v. Ceballos, 547 U.S. at 421 (holding that deputy district attorney's memoranda to his supervisor about problems with search warrant was not protected because it involved "fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case"); Casey v. West Las Vegas Independent School Dist., 473 F.3d at 1331 (holding the superintendent's communications with school board and federal Head Start agency were part of her duties and not protected); Williams v. Dallas Independent School Dist., 480 F.3d 689, 694 (5th Cir. 2007)(holding that athletic director's memoranda to principal about improprieties in athletic accounts over which he did not have control, but from which he received funding, was part of duties and not protected). As Casey v. West Las Vegas Independent School Dist. in particular demonstrates, the supervisor to whom the employee speaks does not have to be the employee's direct supervisor or even someone with whom the employee deals on a regular basis.  See 473 F.3d at 1331.  The communications can be an "unusual aspect of an employee's job that is not part of his everyday functions" and still be pursuant to the employee's duties.  Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1203.

This principle is particularly apt here, because a duty to report to the City Council is not just an obligation implicit in the status of being a senior management official, but an express function of the office of Director of Senior Services.  Chavez-Rodriguez describes one of the responsibilities of her position as conducting "an on-going evaluation of all programs" and "reporting to the city

---

In any case, Chavez-Rodriguez has not established  – as she must under Garcetti v. Ceballos – that her speech to the City Council or individual Councilors is protected, and the Court will not submit this portion of her First Amendment claim to the jury.

governing body regarding progress and <u>concerns</u>."  Complaint ¶ 8, at 3 (emphasis added).

Chavez-Rodriguez makes two arguments that her activity was outside the scope of her duties: (i) that she was acting contrary to city policy by reporting directly to the City Council, and thus could not be acting as an employee; and (ii) that she was in a situation analogous to the superintendent in <u>Casey v. West Las Vegas Independent School Dist.</u>, bringing allegations of misconduct to an outside authority.  Neither of these arguments is sustainable in light of the Tenth Circuit case law.

Chavez-Rodriguez contends that, by speaking directly to the City Council, she was violating departmental regulations, and thus could not be acting within the scope of her duties.  <u>See</u> Protected Speech Motion at 12.  The Defendants counter that the City has no such rule prohibiting direct contact with the Council.  They argue that the evidence Chavez-Rodriguez references indicates only her supervisor's "displeasure at [Chavez-Rodriguez] ignoring the proper chain of command" and "is not evidence of any regulation or policy which prohibited" her from meeting with the City Council.  Response to Protected Speech Motion at 11.

The evidence which Chavez-Rodriguez cites is the deposition testimony of Lovato, her then-supervisor.  The relevant portion of that testimony reads:

Q. . . . Any other management-style issues involving Patricia Rodriguez while you were her direct supervisor?

A.  Going to councilors directly, getting councilors involved.

Q. Why is that wrong?

A.  They're not supposed to do that.  They're supposed to go through the chain of command.  Anything – any communication with a city councilor has to be directed by the City Manager.

Q.  So –

A.  You can't initiate – you're not supposed to initiate anything.

Lovato Dep. at 35:10-22.  Lovato's deposition implies the existence of some ban on communicating with the City Council without the City Manager's clearance.  While the testimony expresses Lovato's "displeasure," it does more than just that.  Lovato stated that employees were "supposed to" follow the chain of command, and that communications "had to be directed by the City Manager."  "Supposed to" and "had to be directed" are phrases that suggest that prior approval was mandatory.  There is nothing inconsistent with the City having such restrictions and imposing a duty on Chavez-Rodriguez to report to the City Council.  Such a rule would not forbid Chavez-Rodriguez from meeting with the City Council; it would, however, require her to obtain the City Manager's advance consent.  There is nothing unusual about the head of a city's administration wanting to be aware of, and have some control over, his subordinates' contacts with the City's governing body.

Admittedly, Chavez-Rodriguez has not produced any written documentation of the existence of this rule.  That alone is not necessarily surprising.  Many rules of the workplace are unwritten, with customs and practices that appear in no handbook or memorandum applying to employees' conduct.  Chavez-Rodriguez has, therefore, provided some evidence that her meetings with the Council were in violation of an informal policy of her department.

Her acting in violation of a workplace custom, however, is not sufficient to automatically establish that her speech was outside her duties.  The teachers in Brammer-Hoelter v. Twin Peaks Charter Academy were directed on multiple occasions by their principal not to talk about the Academy off-campus, but they continued to do so.  See 492 F.3d at 1199.  While the Tenth Circuit found a dozen matters on which they conversed to be outside their duties, the Tenth Circuit did not in its evaluation consider the restrictions that the principal imposed.  Rather, the Tenth Circuit looked at whether the teachers had a supervisory responsibility or duty to report regarding the

matters, where and when the communications took place, and to whom they were made.  See id. at 1205.  When the superintendent in Casey v. West Las Vegas Independent School Dist. expressed her concerns about the Head Start program, the school board told her to "leave it alone," 473 F.3d at 1326, but her subsequent contact with federal authorities was nonetheless found to be within her duties, see id. at 1331.

In general, acting against orders is not sufficient to turn speech that is otherwise part of an employee's job into private speech.  While the Tenth Circuit was careful to note in Casey v. West Las Vegas Independent School Dist. that it did "not mean to suggest that every agent who disregards a principal's instructions not to disclose information is barred from suit by Garcetti," that the plaintiff's job "included the sound administration of federal funds" and that she "conceded that her job duties required her to report to federal authorities" trumped the board's order to stay quiet. 473 F.3d at 1331.  Chavez-Rodriguez is an a similar situation.  While she has presented evidence that she was circumventing office policy by speaking directly with the City Council, the task of talking to the City Council was one expressly within her job description.[8]

The second argument that Chavez-Rodriguez makes is that her situation is analogous to the superintendent's contact with the state Attorney General's office in Casey v. West Las Vegas Independent School Dist., in that she was raising concerns to outside authorities.  See Protected Speech Motion at 14.  Chavez-Rodriguez' situation, however, is different.  The City Council is not an outside entity to the City agencies.  Chavez-Rodriguez has a duty to report to that Council.  Moreover, the Open Meetings Act violations of which Casey was complaining were outside her role

---

[8] The result might be different if Chavez-Rodriguez was able to show a City-wide written regulation that prevented her from speaking with the City Council.  Such a regulation might trump the job description.  The only evidence she has provided, however, is that there was a custom or practice by her supervisor restricting communications to the Council.

as superintendent.  The grievances that Chavez-Rodriguez raised with the Council and individual Councilors concerned issues that were within her portfolio as Director of Senior Services.

The Defendants argue that there is no evidence in the record that Chavez-Rodriguez spoke with individual Councilors, and that the record indicates only that she talked to the City Council as a whole.  A fair implication,  however, can be drawn from Chavez-Rodriguez and Lovato's deposition testimony that she was in contact with Council members individually.  See Chavez-Rodriguez Dep. at 155:5-6 ("I spoke with all members of the City Council[.]"); Lovato Dep. at 35:13-14 ("Going to councilors directly, getting councilors involved.").  The distinction, though, is ultimately immaterial.  Her discussions with individual Councilors is no less official conduct than her statements to the whole Council.  These individual conversations might be less formal than dealing with the assembled City Council in its entirety, but the individuals are still Council members.  Chavez-Rodriguez adduces no evidence to indicate that these meetings were anything other than her trying to inform or influence particular Councilors in their roles as individual members of the governing body of the City.  It is her burden to prove that her actions were done as a private citizen.  She has not met the burden.  Her meetings with individual Councilors were the actions of a government executive trying to express her concerns over her division to higher-ranking government officials.  That advocacy is not the province of a private citizen under Garcetti v. Ceballos; it is the preserve of the public employee.

### B.   CHAVEZ-RODRIGUEZ WAS SPEAKING AS A CITIZEN WHEN SHE TALKED WITH LUJAN.

Chavez-Rodriguez' statements to Lujan were different in character from her involvement with the Santa Fe City Council and its members.  While she spoke with Lujan regarding concerns about her job, she was acting more as a private citizen than an employee.   Chavez-Rodriguez stated

that she met with Lujan at a banquet for volunteers in late April.  See Chavez-Rodriguez Dep. at

82:2.  There were approximately 500 to 600 volunteers present.  See id. at 82:8-9.  Lujan, who was

a family friend Chavez-Rodriguez had known "for many, many years," initiated the conversation.

Id. at 82:13.  In response to Lujan's query, she began telling Lujan her concerns about what was

happening in her division, telling him that she was worried that the program "was in jeopardy of

being dismantled," that she was "worried about funding" and "having to reduce staff hours," and

that she was "worried that money had been cut from the food line item."  Id. at 82:19-24.  This

exchange seems more like a normal conversation between two people who have known each other

a long time about the troubles one of them was having and not as an official communication by a

civil servant.  It is the banquet version of water-cooler talk.

The Defendants have a markedly different characterization of the encounter.  As the

Defendants put it: "[D]uring a business luncheon at which five to six hundred senior services

volunteers were being honored, and [Chavez-Rodriguez] was in attendance as the Division Director

of Senior Services, [Chavez-Rodriguez] expressed her concerns about funding, staffing, and food

services for seniors."  Response to Protected Speech Motion at 12.  They emphasize that Lujan is

"a member of the State Legislature, a 'funding source' for the Division of Senior Services."  Id.

Although the Defendants state that Chavez-Rodriguez' version of events "does not accurately reflect

the record," the record is actually unclear whether the volunteers being honored were senior services

volunteers, and whether Chavez-Rodriguez was attending the banquet in an official capacity.  Both

are fair inferences that could be made from the deposition testimony, but the deposition excerpt

Chavez-Rodriguez attached to her motion does not clearly make these points, and the Defendants

do not offer any other evidence to clarify the matter.  The Court believes, however, that even if it

assumes that the Defendants' contentions on these two points is correct, Chavez-Rodriguez was

acting as a private citizen when she spoke with Lujan.

Considering the banquet to be a job-related function which Chavez-Rodriguez attended in an official capacity does not automatically make all her speech there unprotected.  The Tenth Circuit has stated that "not all speech that occurs at work is made pursuant to an employee's official duties." Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1204 (citing Garcetti v. Ceballos, 547 U.S. at 420 ("Employees in some cases may receive First Amendment protection for expressions made at work.")).  Nor does the fact that her conversation touched on issues important to her job necessarily remove it from the First Amendment's protection.  See Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1204 (noting that not "all speech about the subject matter of an employee's work necessarily made pursuant to the employee's official duties.").  Instead, the Court must take "a practical view of all the facts and circumstances surrounding the speech and the employment relationship."  Id.

The most important factor in the few cases that the Tenth Circuit has decided in this area seems to be the employee's duties and responsibilities.  See, e.g., Casey v. West Las Vegas Independent School Dist., 473 F.3d at 1331 (noting that plaintiff's responsibilities "included a duty to report the District's noncompliance to federal authorities"); Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1199, 1204 (holding that teachers' speech concerning curriculum and discipline were not protected, even though much of the speech was off-campus and after work). Chavez-Rodriguez' job description is the same for reporting to funding sources as it is to reporting to the City Council: "The Director . . . . [c]onducts an on-going evaluation of all programs and reports to funding sources and to the city governing body regarding progress and concerns." Complaint ¶ 8, at 2-3.  This singular job description does not, however, mean that the result is the same.  The key word is "reporting."  Chavez-Rodriguez admitted that she was actively contacting

the City Council and individual Councilors.  Her argument was primarily that city policy forbid her to directly contact them, thus entailing that her speech was outside her duties.  With regards to Lujan, however, the record shows that Lujan initiated the conversation with her.  See Chavez-Rodriguez Dep. at 82:13.  Merely because one person has a duty to report to another does not mean that the employment relationship covers everything between them about an issue within the scope of her employment.  Here, the record indicates that Chavez-Rodriguez was not seeking to report to Lujan.  Moreover, the relationship of a city official to the Legislature is qualitatively different than that same official's relationship to the City Council.  Although the New Mexico Legislature is a funding source for the Division of Senior Services, it does not have the kind of direct oversight that the City Council would.

The context of the banquet also reveals that Chavez-Rodriguez was not speaking as an employee, but as a private individual.  Even if the banquet were work-related, such an event would be seen as more of a ceremonial duty than a managerial one.  Most importantly, the person with whom she was speaking, while a legislator, was also an old family friend.  And she did not seek him out to discuss her concerns; he asked her about how she was doing.  See Chavez-Rodriguez Dep. at 82:10-13.  All of the cases the Tenth Circuit has decided finding that someone was acting pursuant to their official duties involved individuals who were actively communicating.  The superintendent in Casey v. West Las Vegas Independent School Dist. was raising her concerns with state and federal officials.  See 473 F.3d at 1326.  The teachers in Brammer-Hoelter v. Twin Peaks Charter Academy were gathering together to discuss their concerns.  See 492 F.3d at 1199.  The laboratory technician  in Green v. Bd. of County Com'rs was actively seeking to have her laboratory's policy changed and took it upon herself to arrange a confirmation test for a client.  See 472 F.3d at 796.  Chavez-Rodriguez was divulging only her troubles in response to the questions of an old family

friend during a lunch banquet.

Garcetti v. Ceballos does not hold that a person, by virtue of being a public employee, cannot ever talk about matters related to his or her job with others without First Amendment protection. It is difficult to imagine how Lujan and Chavez-Rodriguez could ever discuss work-related matters without the speech being unprotected if the Court were to adopt the Defendants' position. Garcetti v. Ceballos is concerned not with the speaker or the topic per se, but with whether the speaker was addressing a topic pursuant to her role as an employee. It is the role that is important. Given the context in which the speech with Lujan occurred, particularly their longstanding friendship and that Lujan was the party that began the conversation, Chavez-Rodriguez was speaking as a public citizen, and not as Santa Fe's Director of Senior Services.

## II.   CHAVEZ-RODRIGUEZ HAS PROVIDED EVIDENCE THAT SHE SUFFERED MATERIALLY ADVERSE EMPLOYMENT ACTIONS.

The Tenth Circuit has not articulated any definitive standard for what actions can be considered adverse employment actions. The Tenth Circuit has set a ceiling, and possibly a floor – an action need not rise to the level required by Title VII, but probably must be more severe than would be necessary under a chilling-speech standard. See Maestas v. Segura, 416 F.3d at 1188 n. 5.[9] Based on what the Tenth Circuit has stated, the Court concludes that the Chavez-Rodriguez' alleged transfer, the alleged assault, and Coss' alleged reclassification of one her employees can be

---

[9] The Tenth Circuit stated in Maestas v. Segura that it had never adopted the Seventh Circuit's chilling-speech standard. The dissent, however, noted that, in Belcher v. City of McAlester, Oklahoma, the Tenth Circuit stated: "'In reprimanding Belcher, the fire department chilled any future attempts to contact Council members outside of a public meeting. We conclude that this chilling effect is real, and that Belcher has shown that he was subject to adverse employment action as a result of his speech.'" Maestas v. Segura, 416 F.3d at 1195 n. 2 (Briscoe, J., dissenting) (quoting Belcher v. City of McAlester, Oklahoma, 324 F.3d 1203, 1207 n. 4 (10th Cir. 2003)).

considered materially adverse employment actions, and there is sufficient evidence on those incidents to survive summary judgment.

### A.     THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER CHAVEZ RODRIGUEZ WAS TRANSFERRED.

If Chavez-Rodriguez were transferred from her position as Director of Senior Services, that would be an action sufficiently severe to count as an adverse employment action for the purposes of a First Amendment retaliation claim. There is, however, conflicting evidence regarding whether or not Chavez-Rodriguez was transferred. Therefore, a jury must decide whether the transfer occurred.

Although there is no specific test in the Tenth Circuit for determining what constitutes an adverse employment action, the Tenth Circuit has stated that being transferred is sufficiently adverse for First Amendment purposes. See Maestas v. Segura, 416 F.3d at 1188 n. 5 (citing Schuler v. City of Boulder, 189 F.3d at 1309). Even though the Court has already decided that Chavez-Rodriguez does not have a protected property interest in her position – thus precluding a transfer from raising due process issues – that does not affect the analysis in the First Amendment context. See Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1207 ("First Amendment retaliation claims do not depend on a property interest in continued employment.").

Chavez-Rodriguez has presented evidence that she was transferred. For example, she has produced a letter from March of 2007 in which Terrie Rodriguez is named as Interim Director of Senior Services, see Exhibit 7 to Response to Retaliation Motion at 1, Director's Letter, dated March 2007 (Doc. 171-3), and an office telephone directory also listing Terrie Rodriguez as Director, see id. at 2. The Defendants do not dispute that a transfer was proposed, see, e.g., Response to Adverse Action Motion at 9, but contend that the transfer was never completed and that Chavez-Rodriguez

"forced the issue" by declaring she was being transferred at a meeting, id. at 8.  The Defendants'

arguments and evidence demonstrate that there is a genuine issue of material fact whether the

transfer occurred, but do not conclusively establish that the transfer did not happen.  For example,

the Defendants' contention that Chavez-Rodriguez "forced the issue" is based upon her stating a

meeting that "I just want to give you guys notice . . . that I was given verbal notice by Ruben Lovato

. . . we're under reorganization and that I will no longer be the division director.  I will no longer

serve as the division director."  Exhibit 7 to id., Excerpts of 1/17/08 Recording at 3:5-13.  The

Defendants argue that Chavez-Rodriguez made no mention of retaliation, but that is not particularly

surprising, especially as Hiatt, one of the individuals Chavez-Rodriguez alleges retaliated against

her, was apparently around, as he entered the room after Chavez-Rodriguez' outburst.  See Response

to Adverse Action Motion at 7.  The lack of paperwork and absence of a final job description of the

new position Chavez-Rodriguez was to take supports both Chavez-Rodriguez' and the Defendants'

theories.  It could be viewed as evidence that the transfer was an illegitimate act of retaliation that

had bypassed proper channels or as evidence that the transfer was contemplated but never reached

the point of completion.  Ultimately, there is evidence on both sides.  Chavez-Rodriguez is not

entitled to summary judgment in her favor, but neither are the Defendants.  The resolution of this

issue is for the jury.

### B.   SOME OF THE OTHER ACTIONS CHAVEZ-RODRIGUEZ ALLEGES COULD BE MATERIALLY ADVERSE, BUT OTHERS COULD NOT.

In addition to the transfer incident, on which both sides moved for summary judgment, the

Defendants have moved for summary judgment on three distinct incidents or groups of incidents:

(i) Hiatt's swinging a baseball bat at a meeting; (ii) incidents involving Coss; and (iii) incidents

involving Heldmeyer.  The Hiatt incident is potentially severe enough to be an adverse action, and

there is a genuine issue of material fact about how the incident played out that precludes summary judgment.  The incidents involving Coss and Heldmeyer include some incidents that are not materially adverse employment actions, which the Court will dismiss, and others that, if proven, would be materially adverse-employment actions.

> **1.      Hiatt's Allegedly Swinging a Baseball Bat in Chavez-Rodriguez' Direction is, if True, a Materially Adverse Employment Action.**

Chavez-Rodriguez states in her deposition that Hiatt, in her first formal encounter with him, "swung a bat in my direction."  Exhibit 25 to Response to Retaliation Motion, Deposition of Patricia Chavez-Rodriguez at 304:16 (Doc. 171-5).  She states that she was afraid, that she felt she was in danger, and that she thought Hiatt might hit her.  See id. at 306:12-307:1.  The Defendants argue that three eyewitnesses contradict her story, which "is so fantastic as to not merit credence."  Retaliation Motion at 18 (errata).  They also emphasize that Chavez-Rodriguez, in her Complaint, and in her deposition testimony, states that Hiatt swung in her direction, and not at her.  See Reply for Retaliation Motion at 8.  This debate is quibbling over word choice, however, particularly in light of her testimony that she was afraid that she was in physical danger.  The eyewitnesses that the Defendants line up are city employees, which a jury might be inclined to find biased.  Moreover, one side having more witnesses than other side does not mean that side is right.  See, e.g., Tenth Circuit Pattern Jury Instructions (Criminal) § 1.08 (2005).  A jury could find the witnesses to not be credible, and could find Chavez-Rodriguez' version to be correct.  The Defendants' arguments go more to the weight of the evidence than to whether it is sufficient to create a genuine issue of material fact.  Chavez-Rodriguez' testimony is not "so fantastic" that no rational jury would believe it.

If Chavez-Rodriguez' version of events were true, Hiatt's swinging a baseball bat would

constitute assault.  Despite the absence of a definite benchmark in the Tenth Circuit jurisprudence, it is clear that detrimental action in the First Amendment context does not need to rise to the level of Title VII's requirements.  See Maestas v. Segura, 416 F.3d at 1188 n. 5.  Assault is sufficiently severe under the relaxed standards for protected-speech retaliation claims to be materially adverse. Because there is a disputed issue of material fact about what happened, summary judgment is inappropriate, and a jury must decide the issue.

**2.**     **Incidents Involving Coss.**

The Defendants challenge that the incidents involving Coss that Chavez-Rodriguez alleges occurred are not materially adverse-employment actions.  Coss' purportedly saying that Chavez-Rodriguez "will get hers" is not an adverse-employment action.  That incident is merely speech, as the Defendants note, although that does not necessarily make it non-adverse.

Verbal harassment, threats, and reprimands could all be "merely speech," yet rise to the level of being materially adverse.  More importantly here, Coss' statement was not made in Chavez-Rodriguez' presence, but to Montoya outside the Sweeney Convention Center.  See Exhibit 13 to Response to Retaliation Motion, Affidavit of Len Montoya ¶ 4, at 1-2 (Doc. 171-3)("Montoya Aff.").  The statement might show an animus toward Chavez-Rodriguez, but it is not itself a materially adverse action.

The Court also finds that Coss' not responding to a request for a meeting, without more, cannot be an adverse action.  See Exhibit 10 to Retaliation Motion, II Chavez-Rodriguez Dep. at 256:7-17.  Neither can Coss' sending others to represent the City at a meeting on January 22, 2007, with the Aging and Long Term Care Department.  Although Chavez-Rodriguez states that there were other incidents where she was excluded from meetings, see id. at 252:8-13, at the January 22, 2007, meeting, Chavez-Rodriguez was on leave.  See id. at 255:14-22.  In that context, without

something more, the action cannot be adverse.

Coss' allegedly lying to Lujan about Chavez-Rodriguez' position on the separation of services between the City and the County is also not a materially adverse employment action. Chavez-Rodriguez admits that Coss believed that Chavez-Rodriguez was in favor of the separation and that Coss allegedly told Lujan that this was one of the reasons he needed to remove her as Director of Senior Services.  See Response to Retaliation Motion ¶¶ 9, 11, at 3, 4 (admitting Retaliation Motion ¶¶ 33-34, 37, at 7-8).  Even taken in the light most favorable to Chavez-Rodriguez, this statement to Lujan at best reveals that Coss was honestly divulging one of the reasons he had for trying to transfer Chavez-Rodriguez.  That might show motive, but without something more, it cannot be  a materially adverse action.

The Defendants argue that another incident Chavez-Rodriguez alleges, that Coss had an employee in her division reclassified as part-time without her involvement, is not supported by any admissible evidence.  See Retaliation Motion at 22.  The Defendants do not specify what they mean by this defense, but from the Court's perusal of the record, presumably they are arguing that the only evidence available is inadmissible hearsay.  Chavez-Rodriguez does state that she believes Coss had the employee reclassified, based primarily upon what a number of other people told her.  See II Chavez-Rodriguez Dep. at  256:18-258:8  This could be hearsay, but it also could be a series of admissions by city employees acting with the scope of their employment.  See Fed. R. Evid. 801(d)(2)(D). Neither the Defendants nor Chavez-Rodriguez elaborate on what makes this evidence admissible or inadmissible, but the Defendants have the initial burden of demonstrating an absence of evidence and the Court must take all reasonable inferences in the non-moving party's favor, so the Court will assume for the purposes of these motions that there is a reasonable inference that at least some of the statements are based on admissions by employees acting within the scope of their

employment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).   Accordingly, there is evidence that Coss directed the reclassification.  If true, the reclassification could constitute a materially adverse employment action because it was interference with Chavez-Rodriguez' employees and undermining her authority.  See Baca v. Sklar, 398 F.3d at 1221 (holding that removing supervisory responsibilities, depriving a supervisor of the opportunity to supervise a person he or she recruited, and encouraging employees to bypass that supervisor "could be found to constitute adverse employment actions in the First Amendment context").

### 3.    Incidents Involving Heldmeyer.

None of the alleged incidents with Heldmeyer that the Defendants address – with the exception of the transfer incident – are materially adverse employment actions.  Her alleged comments that Chavez-Rodriguez should be moved to a community center where she could "use her pretty little smile at the front desk to greet people," and her supposed displeasure with Chavez-Rodriguez and desire to have her removed from her job, are all very similar to Coss' statement.  As none of them were made in Chavez-Rodriguez' presence, they cannot be characterized as materially adverse employment actions.   This conclusion is not to say, however, that they could not be evidence of causation and motive.

Heldmeyer's statement that she found Chavez-Rodriguez difficult to work with was made directly to Chavez-Rodriguez at a City Council meeting.  See II Chavez-Rodriguez Dep. at 135:1-12. Although reprimands have been found sufficiently adverse in the First Amendment context, see Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1208, this is not a reprimand, but more a mere expression of personal feeling.  The Court concludes that it is not sufficiently adverse.

Finally, Heldmeyer's attending an advisory meeting unannounced and asking seniors

-49-

questions that had already been asked was not sufficiently adverse.  Chavez-Rodriguez concedes that as a City Councilor Heldmeyer had the authority to attend the meeting.  See II Chavez-Rodriguez Dep. at 192:17-19.  Nothing in Chavez-Rodriguez' testimony indicates that Heldmeyer was acting in a way to undermine Chavez-Rodriguez' authority or harass her at the meeting.  Without more, Heldmeyer's attending a meeting she had a right to attend and asking redundant questions is not a materially adverse employment action.

III.   **THERE IS A GENUINE DISPUTE OF MATERIAL FACT WHETHER THE ADVERSE EMPLOYMENT ACTIONS WERE SUBSTANTIALLY MOTIVATED BY CHAVEZ-RODRIGUEZ' PROTECTED SPEECH WITH LUJAN.**

Whether Chavez-Rodriguez' protected speech substantially motivated any of the Defendants to take adverse actions against her is a fact-intensive inquiry and is thus ordinarily for the jury to decide.  See Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192 at 1203.  Nonetheless, "[t]o withstand summary judgment . . . an employee must produce evidence linking the employer's action to the employee's speech."  Maestas v. Segura, 416 F.3d at 1188.  Chavez-Rodriguez has provided sufficient evidence that would allow a rational jury to infer that her protected speech was a substantial factor in motivating the Defendants to take adverse actions against her.  She has not, though, provided evidence that would allow the City of Santa Fe to be liable for the actions of its officials.

There is sufficient evidence from which a jury could infer that Coss took at least two materially adverse actions: having Chavez-Rodriguez transferred and having one of her employees reclassified.  There is no evidence, however, linking him to Hiatt's alleged assault.  The purported transfer took place nearly two years after Chavez-Rodriguez' conversation with Lujan on April 25, 2005; there is no date mentioned regarding when the reclassification took place.  There is also no indication of when other alleged adverse acts – which while not sufficient to be materially adverse,

-50-

might show the start of a retaliatory pattern – began.  Although Chavez-Rodriguez argued at the September 25, 2008 hearing that Lovato began retaliating against her soon after Coss was elected and Lovato became her supervisor, the evidence provided to the Court does not indicate what these actions might have been or when they occurred.   Temporal proximity thus cuts against Chavez-Rodriguez.  She provides, however, evidence that Coss was aware that she spoke with Lujan or someone in his office.  See Exhibit 40 to Response to Retaliation Motion, Chavez-Rodriguez Dep. at 66:17-19 (Doc. 171-7).  In addition to this evidence of actual knowledge of her protected speech, she provides evidence that Coss was out to get her and that he was involved in the alleged transfer. See, e.g., Exhibit 15 to Response to Retaliation Motion, Chavez-Rodriguez Dep. at 68:16-69:8; Exhibit 32 to Response to Retaliation Motion, Chavez-Rodriguez Dep. at 121:7-20 (stating that Coss, Heldmeyer, and Hiatt wanted her removed).

Coss became mayor on March 13, 2006, which is less than a year from when the alleged transfer occurred.  Chavez-Rodriguez offers evidence that Coss intended to take action against her after becoming mayor.  Montoya's affidavit states that Coss said he would get her when he became mayor, see Montoya Aff. ¶ 4, at 2, and Montoya declares that on the night Coss was elected mayor, he heard Coss say about Chavez-Rodriguez: "Now, she's really gone," id. ¶ 2, at 1.  This evidence helps lessen the gap between the protected speech and alleged acts of retaliation.  The temporal link remains slight, but combined with the evidence of actual knowledge and desire to retaliate, Chavez-Rodriguez' evidence is sufficient to withstand summary judgment.

There is also sufficient evidence that a jury could find that Heldmeyer was involved in the alleged transfer, and that she did so because of Chavez-Rodriguez' protected speech, although there is insufficient evidence to link her to any of the other actions that the Court has found could be adverse actions.  Chavez-Rodriguez has presented evidence that Heldmeyer wanted her removed

from her position.  See, e.g., Exhibit 1 to Response to Retaliation Motion, Deposition of Ruben Lovato at 69:12-70:18; Exhibit 32 to Response to Retaliation Motion, Chavez-Rodriguez Dep. at 121:7-20.  Lovato indicates in his deposition testimony that he believed that the initial budget meeting was the source of Heldmeyer's desire to remove Chavez-Rodriguez.  See Lovato Dep. at 70:16-18.  This evidence cuts against demonstrating a link between Chavez-Rodriguez' speech to Lujan and Heldmeyer's alleged involvement in the proposed transfer.  Heldmeyer's desire to have Chavez-Rodriguez removed, however, occurring after Chavez-Rodriguez engaged in protected speech, allows for the inference that Heldmeyer's actual motivation was the protected speech.  Whether Lovato was correct to impute this desire to the budget meeting is an issue for the jury to decide.  If all the Court had before it was protected speech in May 2005 and removal in January 2007, a traditional temporal proximity analysis would call for summary judgment.  But there is more here than just a subsequent transfer; here, there is also evidence that Heldmeyer wanted Chavez-Rodriguez removed at some point after the protected speech.  The parties have not provided evidence showing when Heldmeyer allegedly revealed that motivation, but if it was closely after the protected speech – and reasonable inferences should be drawn in the non-moving party's favor at this stage – the Court believes this additional evidence gives something more than temporal sequencing.

The Defendants argue that Chavez-Rodriguez cannot demonstrate any evidence of causation regarding Hiatt's actions because "even the close temporal proximity between a protected act and alleged retaliation is meaningless unless those causing the alleged retaliatory act are shown to have been aware of the specific activity."  Retaliation Motion at 17 (citing Hysten v. Burlington Northen and Santa Fe Ry. Co., 44 Fed.Appx. 411, 416 (10th Cir. 2002))(errata).  Hysten v. Burlington Northen and Santa Fe Ry. Co. did not state as broad a rule as the Defendants imply.  Rather, the

Tenth Circuit stated only that demonstrating awareness was required where "proximity between a specific litigation activity and the alleged retaliatory act" is the basis for causation.  Id. at 416.  The general rule is that very close temporal proximity may be sufficient to show causation, see Mark v. Schnuck Markets, Inc., 76 F.3d at 329, but that in most circumstances the plaintiff must show something more than proximity.  Chavez-Rodriguez need not affirmatively show that Hiatt was aware of her protected activity.  If the Defendants, though, produce evidence that Hiatt was ignorant of her protected activity, and Chavez-Rodriguez could not counter such evidence, that evidence could show a fatal break in the chain of causation.

The Defendants maintain that "Hiatt could not base any decisions regarding [Chavez-Rodriguez] on . . . issues from 2004 and 2005 because he was unaware of them."  Retaliation Motion at 17 (errata).  They cite to their undisputed statements of material fact, and Chavez-Rodriguez admitted the particular paragraph referenced.  See Response to Retaliation Motion ¶ 19, at 6.  That paragraph, however, states that "Hiatt had no personal knowledge of the operation of the Division of Senior Services or the performance of [Chavez-Rodriguez] before he was employed by the City in October of 2006."  Retaliation Motion ¶ 57, at 11.  The statements indicate only that Hiatt lacked knowledge before being hired – it does not say that he did not later learn about Chavez-Rodriguez' earlier activities.  Because Chavez-Rodriguez has offered evidence that Hiatt bore an animus against her, and wanted her removed, she has met her burden to show a genuine issue of material fact regarding the alleged assault and the transfer.  See Exhibit 32 to Response to Retaliation Motion, Chavez-Rodriguez Dep. at 121:7-20 (stating that Coss, Heldmeyer, and Hiatt wanted Chavez-Rodriguez removed).

While Chavez-Rodriguez has offered sufficient evidence regarding the individual Defendants, she has not come forth with evidence that would allow a jury to find that the City of

Santa Fe was liable.  Respondeat superior liability is not available against a municipal entity. Instead, Chavez-Rodriguez must show that a policy or practice of the City, or a decision of the City's final policy-making body, was responsible for her losses.  See Monell v. New York City Dep't of Social Services, 436 U.S. 658, 691 (1978)("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); Pembaur v. City of Cincinnati, 475 U.S. 469, 481 ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."); Simmons v. Uintah Health Care Special Dist., 506 F.3d 1281, 1285 (10th Cir. 2007). As the Court has already held, there is in insufficient evidence in the record to hold the City liable for the alleged transfer.  See October 9 Memo. at 31.  Coss' alleged reclassification of an employee would fail for similar reasons – there is no evidence of a policy or practice of using such measures, and the City Manager is the final decision-maker for personnel actions.  Finally, there is no evidence that a policy or practice of the City led to Hiatt's alleged assault or that a final decision-maker of the City had some involvement in ordering or instigating that action.  Accordingly, there is no basis in the record for finding a genuine issue of material fact regarding whether the City could be held liable for the actions of any of the individual Defendants.

## IV.   WHETHER THE DEFENDANTS' WOULD HAVE TAKEN STEPS TO TRANSFER CHAVEZ-RODRIGUEZ EVEN IF SHE HAD NOT ENGAGED IN PROTECTED SPEECH IS A DISPUTED FACTUAL ISSUE.

To rebut a plaintiff's case, an "'employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.'"   Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1203 (quoting Lybrook v. Members of Farmington Mun. Schools Bd. of Education, 232 F.3d at 1339).  This defense is principally an issue for the jury.  See Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1203.  The Defendants argue that

problems with Chavez-Rodriguez job performance would have resulted in Hiatt and Lovato taking steps to transfer Chavez-Rodriguez even if she had not engaged in any protected speech.  See Retaliation Motion at 20-21; October Tr. at 21:13-23:15 (Hoffman).  This evidence is not sufficient at the summary judgment stage to eliminate a genuine issue of material fact.  In light of the evidence that Chavez-Rodriguez has produced that would allow a rational jury to infer that her protected speech was a substantial factor in the transfer, the issue is in genuine dispute and should not be resolved on summary judgment.

**IT IS ORDERED** that the Plaintiff's, Patricia Chavez-Rodriguez, Motion and Memorandum for Summary Judgment that She Has Suffered a Materially-Adverse Employment Action is granted in part and denied in part.  The Court grants the motion with respect to the alleged transfer being a potentially materially-adverse employment action, but denies the motion otherwise.  The Defendants' Motion and Memorandum to Strike Plaintiff's Motion and Memorandum for Summary Judgment that She Has Suffered a Materially Adverse Employment Action [Doc. 85] is denied.  The Plaintiff's Motion and Memorandum for Partial Summary Judgement that Her Speech was on a Matter of Public Concern and Protected Speech as a Matter of Law is granted in part and denied in part.  The speech with the City Council is not protected as a matter of law, but the speech with the Speaker of the House is. The Defendants' Motion and Memorandum in Support Thereof for Judgment on the Pleadings on Count I of Plaintiff's Complaint (First Amendment Rights Under the United States and New Mexico Constitutions) is granted in part and denied in part.  The Court will treat the motion as a motion for summary judgment and grant the motion with respect to the speech with the City Council.  The motion is denied with respect to the speech with the Speaker of the House, and the remainder of the motion is denied as moot.  The Defendants' Motion and Memorandum in Support for Partial Summary Judgment on First Amendment Retaliation (Count

I) is granted in part and denied in part as described in the Analysis section of this memorandum opinion and order.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Daniel J O'Friel
Pierre Levy
O'Friel and Levy, P.C.
Santa Fe, New Mexico

   *Attorneys for the Plaintiff*

Steve French
Robyn B. Hoffman
Robert W. Becker
Michelle Blake
French & Associates, PC
Albuquerque, New Mexico

   *Attorneys for the Defendants*